In the Matter of **LOYAL ORDER OF MOOSE, # 259, Plaintiff,**

v.

**COUNTY BOARD OF EQUALIZATION OF SALT LAKE COUNTY, State of Utah, Defendant.**

No. 17573.

Supreme Court of Utah.

Oct. 28, 1982.

Henry E. Heath, Dennis M. Astill, Salt Lake City, for plaintiff.

David L. Wilkinson, Atty. Gen., Theodore Cannon, County Atty., Bill Thomas Peters, Salt Lake City, for defendant.

HOWE, Justice:

Loyal Order of Moose # 259 (Moose Lodge- or Lodge) seeks reversal of a Utah State Tax Commission (Commission) decision which denied it an exemption from the ad valorem property tax for 1977 and 1978 on its lot and building at 607 East 200 South in Salt Lake City.

Moose Lodge is a non-profit corporation organized under the laws of this state and is a charter member of the Loyal Order of Moose of the World. The Lodge's declared purpose is "to unite its members in the bonds of fraternity, benevolence and charity; to assist their families in the time of need; to render particular service to orphaned children, aged members and their wives; and to further the mutual welfare of its members and their families." Current charitable activities of the Lodge include sponsorship of Mooseheart (an Illinois city for orphaned or destitute children), Moosehaven (a Florida city for the aged), and the National Arthritis Foundation. It also participates in a number of community and children's projects at the local level. In fiscal year 1977, approximately 20.6 percent of total Lodge receipts went for charitable donations. In fiscal year 1978, approximately 18.9 percent of total Lodge receipts was donated to charity. Both of these percentages include the value of voluntarily contributed man-hours and donated mileage from private vehicles, as well as proceeds from the rental of the Lodge building.

Additionally, in the years in question the Lodge operated a private liquor club six days a week for members only, held dinners and dances on Fridays and Saturdays and permitted square dance lessons to be taught and wedding receptions to be held for member families in the building.

The building has several rooms and is used for a variety of activities. Two large meeting rooms, for example, are used for social and organizational functions as well as some charitable activities.

Moose Lodge applied to the Salt Lake County Board of Equalization for tax

exemption of the lot and building. When the application was denied, it filed a notice of appeal to the Commission which granted it a formal hearing but also denied it an exemption. The Lodge brings this petition for a Writ of Review but without having expressly waived the right of review and trial de novo in the Tax Division of the Third Judicial District Court. This omission is not jurisdictional. Rather, it is properly treated as a pleading deficiency which was not timely objected to and, in any case, results in no prejudice to the Board. *Salt Lake County v. Tax Commission ex rel. Greater Salt Lake Recreational Facilities,* Utah, 596 P.2d 641 (1979). This Court now entertains this review.

The Lodge contends that the Commission erred (1) in its construction of the constitutional and statutory provisions; (2) because the Lodge's property meets statutory requirements for tax exemption; (3) in its literal interpretation of the constitutional provision which requires exclusive use of property for charitable purposes; (4) by its application of the actual use of the property in question as a test for a property tax exemption; (5) in concluding that the Lodge's property was used primarily as a center of social and recreational exchange rather than exclusively for charitable purposes; and (6) because the Commission's findings of fact are inadequate and unsupported by substantial evidence.

## I.

The constitutional provision in issue is Article XIII, Section 2 of the Utah Constitution which provides in part:

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. The property of the state, counties, cities, towns, school districts, municipal corporations and public libraries, *lots with buildings thereon used exclusively for either religious worship or charitable purposes* . . . shall be exempt from taxation. [Emphasis supplied.]

U.C.A., 1953, § 59–2–1, *et seq.,* complement Article XIII, Section 2. Section 59–2–30 provides:

*Property used for religious worship or charitable purposes—Requirements for exemption.* This section is intended to clarify the scope of exemptions for property used exclusively for either religious worship or charitable purposes provided for in section 2 of Article XIII of the Constitution of the state of Utah. This section is not intended to expand or limit the scope of such exemptions. Any property whose use is dedicated to religious worship or charitable purposes including property which is incidental to and reasonably necessary for the accomplishment of such religious worship or charitable purposes, intended to benefit an indefinite number of persons is exempt from taxation if all of the following requirements are met:

(1) The user is not organized to produce a profit from the use of the property.

(2) No part of any net earnings, from the use of the property, inures to the benefit of any private shareholder or individual, but any net earnings shall be used directly or indirectly, for the charitable or religious purposes of the organization.

(3) The property is not used or operated by the organization or other person so as to benefit any officer, trustee, director, shareholder, lessor, member, employee, contributor, or any other person through the distribution of profits, payment of excessive charges or compensations.

(4) Upon the liquidation, dissolution, or abandonment of the user no part of any proceeds derived from such use will inure to the benefit of any private person.

Section 59–2–31 provides:

*Applicability of constitutional provision for exempting property used for charitable purposes.—*

(1) Property used exclusively for religious, hospital, educational, employee representation, or welfare purposes which use complies with the requirements of

section 59–2–30, shall be deemed to be used for charitable purposes within the exemption provided for in section 2 of Article XIII of the Constitution of the state of Utah, and section 59–2–30.

(2) This section shall not defeat exemptions for property not specifically enumerated which may be found to be within the exemption provided in section 2 of Article XIII of the Constitution of the state of Utah.

■ The Commission has construed the constitutional exemption strictly when applied to club houses and to fraternal and benevolent societies. Moose Lodge argues that the policy consideration to encourage charity favors a liberal construction of the exemption. However, in view of the important policy consideration that the burdens of taxation should be shared equitably, the general rule is that the language of the exemption should be strictly construed. This rule was recognized early in the jurisprudence of this state in *Parker v. Quinn,* 23 Utah 332, 64 P. 961 (1901). Although we departed from that rule for many years,[1] recent cases of this Court have again followed it. *Salt Lake County v. Tax Commission ex rel. Good Shepherd Lutheran Church,* Utah, 548 P.2d 630 (1976); *Baker v. One Piece of Improved Real Property,* Utah, 570 P.2d 1023 (1977). In the latter case, we specifically held that general rule of strict construction to apply to tax exemptions for club houses and fraternal and benevolent societies. Therefore, the Commission's application of the general rule to the present case was correct.

## II.

■ The Lodge contends that its property meets the statutory criteria (§§ 59–2–30 and 31) for exemption. However, that is no guarantee that the Lodge is in a "safe harbor" of exemption. Our statutes granting tax exemptions cannot be broader or narrower than our constitutional provision on which they are based. The legislature, in this particular instance has made this rule clear in the statutory provisions themselves. Pertinent statutory language from § 59–2–30 explains:

> This section is intended to clarify the scope of exemptions for property used exclusively for either religious worship or charitable purposes provided for in section 2 of Article XIII of the Constitution of the state of Utah. This section is not intended to expand or limit the scope of such exemptions.

Section 59–2–31(2) provides:

> This section shall not defeat exemptions for property not specifically enumerated which may be found to be within the exemption provided in section 2 of Article XIII of the Constitution of the state of Utah.

Thus Section 2 of Article XIII grants a charitable exemption and our statutes cannot *expand* or *limit* the scope of the exemption or *defeat* it. To the extent the statutes have that effect, they are not valid. See *Salt Lake County v. Tax Commission ex rel. Good Shepherd Lutheran Church,* supra.

## III.

The Lodge contends that the Commission committed error by literally reading Section 2, Article XIII to require that property be "used exclusively" for charitable purposes in order to qualify for tax exemption. The

---

1. The departure came in *Salt Lake Lodge No. 85, B.P.O.E. v. Groesbeck,* 40 Utah 1, 120 P. 192 (1911) where this Court stated that there was an exception to the general rule of strict construction of exemptions, viz., where the exemption is for educational or charitable purposes or for public worship. Such exemptions, we stated, should receive a broad and more liberal construction than those exempting property used for gain or profit only. "The reason for the rule is that the State, by exempting property used exclusively for one or more of the purposes mentioned from taxation, is presumed to receive benefits from the property equivalent at least to the public revenue that would be otherwise derived from it." *Id.* at 40 Utah 8, 120 P. 194. We further noted there that the assistance given by charitable institutions and organizations correspondingly relieved the State of the burden of furnishing that assistance. This same justification for a liberal construction was repeated in *B.P.O.E. No. 85 v. Tax Commission,* Utah, 536 P.2d 1214 (1975).

thrust of its argument is that in a long succession of cases this Court has interpreted the provision broadly because to be literal is to foil the intent of the provision to grant charitable exemptions.

We recognize the strictness of the plain meaning of "used exclusively." Such a use is one which is singly or solely devoted. At the same time, we appreciate our responsibility to interpret "used exclusively" in a manner consistent with constitutional and legislative intent to grant charitable exemptions.

In *Parker v. Quinn*, supra, this Court was able to preserve the legislative intent to allow a charitable exemption without broadening the constitutional language.[2] In that case the Mormon Fifteenth Ward Relief Society, organized and acting to minister to the poor, sick and destitute members of the community, owned a two-story brick building. The top floor of the building was used continuously by the society in furtherance of its charitable purposes. The bottom floor contained two storerooms which were customarily rented out. The rents were used for charitable purposes and were part of the sums disbursed annually by the society. Further, all members of the society served without remuneration. This Court rejected the notion that the dual use of property worked a loss of its exemption, and held that according to the weight of authority "That part of the building occupied and used exclusively by the society for charitable purposes is exempt while the other part not so used may be taxed." *Parker v. Quinn*, 23 Utah at 341–342, 64 P. at 963. The Court explained its reasons for not exempting the portions rented out as follows:

If, therefore, in the fundamental law, in addition to specifying lots and buildings thereon used "exclusively" for charitable purposes, rentals derived from such buildings and used for such purposes were also enumerated, we would have no difficulty in this case in declaring the whole property, including the portion rented and held for rent, exempted from taxation, but the lawmakers did not see fit to exempt such rentals, in express terms, and we can furnish no aid by construction.

*Parker v. Quinn*, 23 Utah at 338–339, 64 P. at 962.

In *Salt Lake Lodge No. 85, B.P.O.E. v. Groesbeck*, 40 Utah 1, 120 P. 192 (1911), our concern that the promotion of charity not be thwarted by too strict a construction of the "used exclusively" provision led us to hold that *incidental* non-charitable use of the property would not defeat an exemption. While the Court noted that the involvement of a third-party renter found in *Parker v. Quinn* was not present, and approved the necessity of socializing among lodge members for the purpose of promoting charity, the crucial distinction between these two cases was the manner of using the buildings. In *Parker v. Quinn*, the part of the building used for non-charitable purposes was clearly separated from that part used for charitable purposes. In *Groesbeck*, the entire building was used both for charitable and non-charitable social purposes but without separation. We found that the use for social purposes in *Groesbeck* was incidental to the main charitable purposes of the lodge. Explaining that a literal, strict construction of the "used exclusively" provision would result in virtually eliminating tax exemptions and thereby violate the intent of the Constitution to promote charity, the Court held that the *incidental* use for social purposes by the

**2.** Art. 13, Sec. 3 was the constitutional provision parallel to the present Art. XIII, Sec. 2. Art. 13, Sec. 3 provided "That the property of the United States, of the State, counties, cities, towns, school districts, municipal corporations and public libraries, lots with the buildings thereon used exclusively for either religious worship or charitable purposes, and places of burial not held or used for private or corporate benefit, shall be exempt from taxation." The

statutory provision was found in Section 2503, Revised Statutes 1898, and read: "The property of the United States, of the State, counties, cities, towns, school districts, and public libraries and lots with buildings thereon used exclusively for either religious worship or charitable purposes, and places of burial not held or used for private or corporate benefit, shall be exempt from taxation."

lodge which did not exclude or interfere with its use for charity did not disqualify the property from exemption. Chief Justice Frick, while not disagreeing that incidental use for non-charitable purposes did not defeat an exemption, dissented on the facts of that case on the ground that the carrying on of a saloon and restaurant business and the maintenance of a billiard and card rooms, occupying two-thirds of the building, could not be dismissed as "incidental" to the use of the building for charitable purposes.

█ We see wisdom in a rule which does not deny a tax exemption to property which is used for charitable purposes simply because there is a de minimus non-charitable use. The exemption need not be interpreted as the law of the Medes and Persians.[3] The intent of Section 2, Article XIII to encourage charity is preserved where inadvertent or extremely minor non-charitable uses of property do not foreclose an exemption. However, where the non-charitable use rises to the level that it must be weighed against charitable use in order to determine which use is dominant, then clearly the non-charitable use is well beyond the point of de minimus and should unquestionably preclude an exemption.

Nonetheless, in recent years the *Groesbeck* interpretation of the constitutional "used exclusively" provision has been gradually extended to the point that an exemption has been allowed if the use of the property has been *primarily* to engage in and foster activities which are charitable. In *B.P.O.E. v. Tax Commission,* Utah, 536 P.2d 1214 (1975), this Court weighed the $300,000 gross revenue of a lodge against its expenditure of $29,000 for charitable purposes, ignored that one floor of the lodge building was clearly severable as entirely used for charitable purposes, and allowed an exemption of the entire property on the basis of mixed use of the building as well as charitable activities carried on at locations and buildings other than the building in question.

In the following year, 1976, this Court began a retreat from the broad limits to which it had gone. In 1976, we decided *Salt Lake County v. Tax Commission, ex. rel. Good Shepherd Lutheran Church,* supra, and there denied a property tax exemption to a church for its parsonage despite the fact that some church functions were carried on there. We held that it could not be classified as being used exclusively for religious worship. This tightening up was followed in 1977 by *Baker v. One Piece of Improved Real Property, etc.,* supra, where we denied an exemption to the same Moose Lodge which is involved in the instant case on the ground that the use of the property partook more of the nature of a social club than it did of a place used solely for charitable purposes. We attempted to distinguish the 1975 *B.P.O.E.* case on the ground that the evidence in that case showed that one entire floor was used exclusively for charitable purposes and on the ground that practically ten percent of the total expenses went for charitable purposes whereas in *Baker,* only two percent was so spent. With these dubious differences, the Elks case was distinguished.

█ In retrospect, it is clear that commencing in 1911 in *Salt Lake Lodge No. 85, B.P.O.E. v. Groesbeck,* supra, and culminating in the 1975 *B.P.O.E.* case, we stretched the "used exclusively" provision beyond its clear meaning even though we occasionally paid lip service to the obvious limitations of that language. For example, in the 1975 *B.P.O.E.* case we said:

> Nothing in this opinion can be construed to sustain a tax exemption based solely on the fact that a non-profit organization has a charitable purpose as to its object. Nor, could this opinion prevent the loss of a tax exemption should an organization allow its charitable purpose to become dulled, and cease to be its dominant activity.

536 P.2d at 1219. We have allowed ourselves to be placed in the impossible situation of deciding whether the contribution of two percent, ten percent, or twenty percent

---

**3.** Daniel, Chap. 6; J. Wolfe in *Provo City v. Claudin,* 91 Utah 60, 63 P.2d 570 (1936).

of its receipts to charity is enough to qualify an organization for a property tax exemption on its lot and building. Even under a liberal construction (which would make the "dominant" or "primary" use determinative rather than the exclusive use), it is difficult to justify some of our decisions which have granted exemptions. We, therefore, must and do overrule the broadened interpretations which this Court gave in *Groesbeck* and subsequent cases relying thereon and return to the standard enunciated in *Parker v. Quinn,* supra, in 1901: The constitutional exemption is to be strictly construed and the charitable use of the property must be exclusive; however, a use of true minor import or a de minimus use will not defeat an exemption. If there is any separate part of the building occupied and used exclusively for charitable purposes, that part qualifies for exemption.

## IV.

A related question which is raised by Moose Lodge is the consideration of the actual use of the property as a test for a property tax exemption. Moose Lodge contends that the Commission committed error by applying this "actual use of the property" test to it. Because of our interpretation of "used exclusively," that issue need not be considered here.

## V.

■ The Lodge further contends that the Commission committed error in concluding that the Lodge's property was used primarily as a center of social and recreational exchange rather than exclusively for charitable purposes. The evidence reveals that the Lodge's property was not used exclusively for charitable purposes but was used for both charitable and social purposes. Therefore, under the rule that the charitable use must be exclusive (previously explained in Part III of this opinion), whether the non-charitable use was primary or not primary is not the test. Clearly, the non-charitable use was not de minimus and the property does not qualify for an exemption.

## VI.

The Lodge's final contention that the Commission's findings of fact are inadequate and unsupported by substantial evidence is without merit. We have reviewed them and there is competent evidence in the record to support them.

## VII.

Moose Lodge's circumstances parallel the facts in the 1975 *B.P.O.E.* case, but as heretofore stated we conclude that the interpretation made there is incorrect and we decline to follow it. In doing so, however, we harbor concern for the harsh effect, not only on the parties to this action but on others similarly situated who have carried on their charitable and organizational activities in reliance upon the "primary use" rule.

■ Ordinarily an overruling decision has retroactive operation. *State Farm Mutual Insurance Company v. Farmers Insurance,* 27 Utah 2d 166, 493 P.2d 1002 (1972) (language appears there as dicta). Retroactive operation occurs, to some degree, whenever a case is applied in any manner to control the legal consequences flowing from fact situations which arose at a point earlier than the announcement of the new rule. The application may be to parties and facts of the case where the new rule is announced, to pending cases, to future-initiated cases arising from earlier events, or in some rare instances to terminated cases which are subject to collateral attack. Annot., 10 A.L.R.3d 1371.

■ Constitutional law neither requires nor prohibits retroactive operation of an overruling decision. A decision's operative effect is treated as a function of judicial policy rather than judicial power. *Thome v. City of Newton,* 229 Kan. 375, 624 P.2d 454 (1981). See also *LaRoque v. State,* 178 Mont. 315, 583 P.2d 1059 (1978), and *Vaughn v. Murray,* 214 Kan. 456, 521 P.2d 262 (1974). In other words, the extent of the decision's application is left to the discretion of the court. Annot., 10 A.L.R.3d 1371, supra; *Lau v. Nelson,* 92 Wash.2d 823,

601 P.2d 527 (1979); *Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974).

■ Where overruled law has been justifiably relied upon or where retroactive operation creates a burden, the court, in its discretion, may prohibit retroactive operation of the overruling decision. *State Farm Mutual Insurance Co. v. Farmers Insurance,* supra. In such instances, prospective operation of a court decision has long been applied. *Great Northern Railway v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254 (1932). In some cases, purely prospective application of the declared law of the case results in the new law not applying to the parties of the overruling case. *Hicks v. State,* 88 N.M. 588, 544 P.2d 1153 (1976); *Poafpybitty v. Skelly Oil Co.,* Okl., 394 P.2d 515 (1964); *Continental Supply Co. v. Abell,* 95 Mont. 148, 24 P.2d 133 (1933); *Montana Horse Products Co. v. Great Northern Railroad Co.,* 91 Mont. 194, 7 P.2d 919 (1932); *Jones v. Woodstock Iron Co.,* 95 Ala. 551, 10 So. 635 (1891); 10 A.L.R.3d 1371, § 7, supra.

In *Oklahoma County v. Queen City Lodge No. 197, I.O.O.F.,* 195 Okl. 131, 156 P.2d 340 (1945), the court announced a new rule but gave its decision prospective effect only. The court explained that the prospective ruling was to "permit taxation of all properties affected by this rule only in the future without assessment thereof for any back taxes for prior years." 195 Okl. at 150, 156 P.2d at 358. See *Gibson v. Phillips University,* 195 Okl. 456, 158 P.2d 901 (1945); *Board of Equalization v. Tulsa Pythian Benevolent Association,* 195 Okl. 458, 158 P.2d 904 (1945).

Some courts which have applied the new law of a case purely prospectively have delayed the effective date to a future time. For example, in abolishing a rule of governmental immunity, the court in *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969) delayed the effective date of the abolition to August 30, 1969, a few weeks after the issuance of the opinion, and held the new rule not applicable to torts which occurred prior to that date. In so doing the court stated:

We are of the opinion that reasonable time should be given the various public bodies to meet the new liabilities implicit in this decision.... (See *Molitor v. Kaneland Com. Unit Dist.,* 18 Ill.2d 11, 163 N.E.2d 89, 86 A.L.R.2d 469; *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618, and cases cited therein.) 203 Kan. at 851, 457 P.2d at 29. Recently, finding the broad jurisdiction granted by the Bankruptcy Reform Act of 1978 to be unconstitutional, the U.S. Supreme Court in a plurality decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), applied its ruling only prospectively and stayed its judgment until October 4, 1982 (but which has now been extended to December 24, 1982) in order to allow Congress to act without impairing the interim administration of the bankruptcy laws.

■ We believe the circumstances of this case require that the rules adopted in this decision be applied prospectively with a delayed effective date. The holding in the 1975 *B.P.O.E.* case has been the law upon which many organizations have operated and upon which tax exemptions have been granted or denied. Further, the step in the direction of that case was first taken in the *Groesbeck* case in 1911. Without warning it would be inequitable to correct an interpretation of law that has been relied upon for so many years. Also, if the rule were to be given retroactive effect, the assessment of back taxes on properties affected by this rule might well result in an unreasonable burden upon all those organizations and governmental bodies associated with it. By staying the effective date of our ruling in this case, not only are court and agency resources saved, but time also is allowed for organizations affected to make needed adjustments.

This correction of a misinterpreted line of law should not and shall not work harshly against the appellant here. As we have previously observed, the instant case is parallel to the 1975 *B.P.O.E.* case; and, while the law in that case remains in force, this

case should be treated accordingly. Cases or administrative proceedings pending or arising in the interim between the issuance of this opinion and the effective date of the rules announced here will also be determined according to the old rule.[4]  Beginning January 1, 1983, the rules of this case will become effective.

The decision of the Commission denying an exemption for 1977 and 1978 is reversed. No costs awarded.

HALL, C.J., and STEWART and DURHAM, JJ., concur.

OAKS, Justice (concurring):

I concur in the opinion of the Court, and write to elaborate additional considerations bearing on this important decision.

Our Constitution directs that property "used exclusively for either religious worship or charitable purposes ... shall be exempt from taxation." Utah Const. art. XIII, § 2.  This decision represents no retreat from that command and no default from our duty to enforce it.

Instead, we confront the fact that in 1911 *Salt Lake Lodge No. 85, B.P.O.E. v. Groesbeck,* 40 Utah 1, 120 P. 192 (1911), erroneously interpreted that provision as permitting exemption of property used partially but not entirely for exempt purposes.[1]  That decision allowed our tax exemption law to drift from the verbal moorings of the Constitution until today the familiar word "exclusively" has lost its literal meaning and has come to mean something entirely different—"primarily."

As a result, we have had confusion in the law governing tax exemption of property used partially but not exclusively for religious or charitable purposes.  In the face of inconsistent rulings and judicial opinions without a governing rationale, religious and charitable organizations cannot be certain what level or proportion of nonexempt activities will cause the loss of an exemption on particular property, and neither can lawyers, legislators, administrators, and judges.  This uncertainty makes tax administration expensive for everyone.  Inconsistent results discredit the property tax exemption for religious and charitable purposes, and could contribute to its eventual dilution or demise.  The legislature cannot adopt corrective legislation, since it has no power to alter this Court's interpretation of the Constitution.

Of even greater concern in the long run is the fact that any significant deviation from the commonly accepted meaning of any nontechnical word in the Constitution casts doubt on the commonly accepted meaning of nontechnical words in every other provision.  The Constitution was adopted and amended by the sovereign power of the people of this state.  It belongs to the people.  The people should be able to read its provisions in reliance on the fact that nontechnical words with commonly accepted meanings will be given effect according to those meanings.  As Chief Justice John Marshall declared in *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 188, 6 L.Ed. 23 (1824), "the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."[2]

---

**4.**  The old rule being: charitable activities must be dominant and may be carried on or off the property; other activities must be in furtherance or in support of charity; at least 10% of gross proceeds must be donated to charity as well as a significant contribution of time and labor.

**1.**  As explained in the Court's opinion, *Groesbeck* erred in permitting an exemption of an entire building that was used for exempt and nonexempt purposes, without separation.  The above criticism does not refer to the earlier decision in *Parker v. Quinn,* 23 Utah 332, 64 P.

961 (1901), that a clearly separable portion of a building used exclusively for the prescribed purposes may be exempt.

**2.**  Consequently, the traditional view maintains that terms used in a constitution should be interpreted in the sense most obvious to the common understanding of the people who adopted it.  *State v. Butler,* 70 Fla. 102, 133, 69 So. 771, 780 (1915); *Bishop v. State,* 149 Ind. 223, 230, 48 N.E. 1038, 1040 (1898); 1 T. Cooley, A Treatise on the Constitutional Limitations, at 124–36 (8th ed. 1927).

If constitutional interpretation is to be governed by a rule of law rather than a rule of men, judges must follow the commonly accepted meaning of words that have such meaning. If a word incorporated into the Constitution loses its commonly accepted meaning and serves only as a starting point for judicial improvisation, that document cannot be said to express the will of the people except in the most tenuous sense.[3]

Admittedly, judges have not always followed the commonly accepted meaning of nontechnical words in constitutional provisions (in this state or elsewhere), and the rules those decisions have established in our constitutional law may be ingrained beyond recall except by constitutional amendment. But the principle discussed here is a worthy ideal and an appropriate basis of action for the future. It is also an appropriate basis for a corrective decision whenever this would not cause excessive disruption. That is so here, since the new interpretation can be applied prospectively and will not become effective until after an adequate period of notice to those affected by it.

By this decision, we increase predictability and reliability in interpreting every provision of the Constitution. If our decision on this tax exemption provision is contrary to the will of the people of this state, they can exercise their sovereign power to amend the provision we have construed. In that case, the meaning of the language in the new provision will be more predictable and more reliable under the precedent of this decision.

---

3. The process of constitutional interpretation is more complicated where a constitutional provision uses words or phrases without commonly accepted meaning among the people who adopted it. Examples of such words or phrases include "due process of law," "habeas corpus," and "charity." With such terms as these, the Court has more latitude for interpretation. It is well settled that the first resource of interpretation is the content of the common law. *Ex Parte Grossman,* 267 U.S. 87, 108–09, 45 S.Ct. 332, 332–333, 69 L.Ed. 527 (1925); *United States v. Wong Kim Ark,* 169 U.S. 649, 654, 18 S.Ct. 456, 459, 42 L.Ed. 890 (1898). Beyond that common ground lies a fundamental conflict on which no position need be taken for purposes of this case. *E.g.,* compare Grey, "Do We Have an Unwritten Constitution?" 27 Stan. L.Rev. 703 (1975), with R. Berger, Government by Judiciary (1977).

For a decision applying the generally accepted meaning of nontechnical terms see *Holden v. N.L. Industries, Inc.,* Utah, 629 P.2d 428 (1981) ("only"). For a decision applying techniques of constitutional construction to a term used in a technical sense, see *Hansen v. State Retirement Board,* Utah, 652 P.2d 1332 (1982) ("state officers").